## CIRCUIT COURT OF THE CITY OF ROANOKE

Great American Insurance Co.

v.

Eglenna F. Cassell, Admx. of the
Estate of Robert G. Cassell,
deceased

December 14, 1988

Case No. (Law) 86-000763

By JUDGE JACK B. COULTER

This is a declaratory judgment action brought by Great American Insurance Company (hereinafter referred to as Great American) to determine whether or not it owes coverage to Eglenna F. Cassell, Admx. of the Estate of Robert G. Cassell, deceased (hereinafter referred to as Cassell) under the underinsurance endorsement to its comprehensive automobile liability policy issued to the City of Roanoke.

Shortly after midnight on November 1, 1985, Robert G. Cassell, a captain of the City of Roanoke Fire Department, responded to a call that a vehicle was on fire at the T-shaped intersection of Westwood Boulevard and Shenandoah Avenue in the City of Roanoke. He and three other

firemen rushed to the scene in a fire pumper truck followed by a fire tanker, both owned by the City of Roanoke. Cassell was the senior officer present and supervised extinguishing the fire, which was accomplished in about five to ten minutes by use of a hose carrying water directly from the fire truck.

Cassell was standing in the westbound lane of traffic with another fireman, Harvey H. Helm, beside the automobile that had been on fire taking information from its owner, Brenda Carol Downs, when all three were struck and killed by a speeding, hit-and-run vehicle, heading west. The fire engine in which Cassell had arrived was parked with its red lights activated about halfway in the eastbound lane of traffic on Shenandoah Avenue and halfway on the adjacent shoulder, heading east about twenty to twenty-five feet from the disabled Downs vehicle which was headed west straddling the center line. With their lights flashing, the fire trucks were being used to restrict or influence the flow of traffic. The other firefighters, Lt. Allan R. Keys and Firefighter Michael W. Milton, were taking some equipment back to the fire engine at the time the hit-and-run vehicle struck Cassell, Helm, and Downs. Cassell was about twenty to twenty-five feet from the fire engine when he was hit and killed.

The fire had been attacked by the use of a booster line, a small fire hose, that was attached to the pumper truck in which Cassell had arrived. The water that was used to put out the fire came from the same truck, rather than from a street hydrant. A crowbar that had come from the pumper truck had been used by Cassell to open the hood of the Downs car and was being returned at the moment Cassell was struck. And Cassell was using a writing pad on a clipboard taken from the truck when he was killed.

Cassell has brought a wrongful death action against Roger Lee White, the driver of the hit-and-run vehicle, seeking compensatory damages in the amount of $1,250,000 and punitive damages in the amount of $1,000,000. White was insured by Harleysville Insurance Company with limits of $50,000. Cassell contends that Great American is liable for $1,000,000 underinsurance coverage as that was the amount of its liability limits at the time of the fatal accident. Great American maintains that Cassell was not a name insured under its uninsured motorist endorsement

and that he was not "occupying" the vehicle at the time he was struck nor was the fire truck being "used" as contemplated by § 38.1381(c).[1] Further and alternatively, Great American argues that if it should be held that Cassell is covered under the endorsement, the limits in effect at the time were only $25,000, not the $1,000,000 claimed, and that, therefore, there is no underinsurance available.

*The first issue: Since the policy purports to insure "family members" of a municipal government, is an employee, such as Cassell, covered?*

The first question to resolve is whether or not Cassell was a named insured under the endorsement. The policy, it must be remembered, is a business policy insuring the City of Roanoke and defining its insured as "You or any family member."

Cassell argues that he is a family member; that is, that he is a member of the family of the City of Roanoke, being an employee; that the policy was authored by the insurance company, and that these words must have some significance; and that a "family member" of the City of Roanoke, a legal person not capable of having blood relatives, must embrace its employees or be construed to be meaningless surplusage.

Great American, on the other hand, points to its definition of "family member" also contained in its policy as being "a person related to you by blood, marriage, or adoption who is a resident of your household, including a ward or a foster child."

Whether the provisions and phraseology used were "boiler plate" or not, as Great American offers in explanation, is quite beside the point. The fact remains that a large, well-staffed insurance company writing a policy for which a premium of $66,166 was being exacted used language that is susceptible to the interpretation urged by Cassell. What did Great American mean when it chose

---

[1] References are made throughout this opinion to Sections 38.1-380.2 and 38.1-381, which were the statutes in effect at the time pertinent to this litigation. These provisions are now included, with certain amendments in Sections 38.2-2206 and 38.2-2202.

to define its named insured, knowing it to be a municipal corporation, to include "any family member"? Can it be seriously suggested that an insurance company of such national repute with specialized departments of experts, could insert meaningless dribble in so important a document? What or who did Great American intend to be included in the family membership of the City of Roanoke? The dictionary definition of family is *not* limited to household entities, nor relationships of blood or marriage. The term by common conception includes a "group of kindred persons" or "an association of people with common characteristics." The family of man, the family of Christ, church or neighborhood families are all frequent and meaningful expressions. Roanoke's Mayor in the City's annual open house and Christmas party for its employees and on other occasions has frequently referred to the City's Family of Employees.

Great American argues, however, that the definition it has given to "family members" necessarily excludes a City employee. But this definition is also irrelevant because the "you" referred to in the definition, being the City of Roanoke, could not possibly have any person "related to (it) by blood, marriage or adoption who is resident of (its) household, including a ward or foster child." What is the City's household? How can a City have a foster child?

Such careless, inappropriate, and irresponsible language chosen by an insurance company and supposedly crafted by experts skilled in the profession of words and language should not be lightly cast aside nor interpreted as unintended surplusage. The excuse or justification that it was merely carried over as "boilerplate" language falls on unsympathetic ears; it is a lame and unworthy contention. Cassell's position on this point is not so far-fetched as Great American suggests.

Notwithstanding the above observations and analysis, however, and hopefully having chastised Great American for the inexactness and ambiguity that it has created, this Court simply cannot stretch the term "family member" to include all of the City's 1750 employees. Despite the language used and the unhealthy result of allowing one provision in a contract to take away what another provision has granted, this Court feels compelled to hold -- with obvious reluctance -- that it was not within the intention

of the parties to extend uninsured and underinsured motorist protection to all of the family members of the City of Roanoke.

*The second issue: If not a named insured, nonetheless, was Cassell occupying or using an insured vehicle within the intent of Section 38.1-381(c)?*

Cassell, then, not being a named insured or family member, was he "anyone else *occupying* a covered" vehicle within the parameters of § 38.1-381(c)?

Great American argues that the policy restricts this potential extension of coverage to anyone else (which would include Cassell) "occupying" a covered vehicle, and such is the limiting phraseology of the policy itself. The definition of "occupying" in the policy expressly restricts the coverage to someone being "in, upon, getting in, on, out or off" of a vehicle. Clearly, Cassell was not occupying the fire truck when he was struck and killed; he was at least 20 to 25 feet away.

Code Section 38.1-381(c), however, extends this potential coverage to anyone "using" an insured vehicle. This statute defines an "insured" to include "any person who *uses* . . . the motor vehicle to which the policy applies." The *use* of a vehicle is a much broader concept than *occupying* it, and hence, the question to resolve is not whether Cassell was "occupying" the fire truck at the time of the accident; he clearly was not. The issue is whether or not he was *using* the vehicle, a point Great American now apparently concedes.

The plaintiff relies heavily on *Insurance Company of North America v. Perry*, 204 Va. 833 (1964). In this case, a Norfolk policeman, who had parked a city police cruiser and walked some 164 feet away from it along the highway to serve a warrant, was struck and killed by a passing motorist. The court, while extending the coverage to use rather than occupancy, concluded:

> In the case before us, Peterson (the policeman) met his death when he was on foot, 164 feet away from the parked cruiser, engaged in the act of serving a warrant. Under these circumstances, we hold, as a matter of law, that Peterson's

fatal injury did not occur while he was using the police cruiser. He was not then an insured under the policy. He was not then under the canopy of the coverage provided by the statute.

The other case relied on by Great American, *Pennsylvania National Mutual Casualty Insurance Company v. Bristow*, 207 Va. 381 (1966), is really not on point, as Cassell demonstrates in his memo of October 14, 1988. The vehicle involved in *Bristow* was the stalled car that Bristow was trying to repair, not the vehicle he had been driving. The issue in the case at bar is whether Cassell was using the fire truck, not the Downs vehicle. And as suggested in *Bristow*, even the more restrictive term "occupying" could be expanded to include those "whose connections therewith immediately relates to his occupying it."

Decisions from other jurisdictions with similar factual situations are of great benefit in considering whether or not the fire truck in the case at bar was being used by Cassell at the moment of his fatal injury. In *Rau v. Liberty Mutual Insurance Co.*, 585 P.2d 157 (Wash. 1978), the court held that a truck driver, who was struck by an uninsured motorist some twenty feet from his parked truck which he had briefly left to inquire about directions, was "using" his truck at the time of the accident and was therefore covered under an uninsured motorist endorsement. The court analyzed several similar cases from other jurisdictions in which coverage was extended. (*Hartford Accident & Indemnity Co. v. Booker*, 230 S.E.2d 70 (Ga. 1976), holding that a sanitation worker was "using" the garbage truck when hurt though not occupying it at the time; *Federated Mutual Implement & Hardware Ins. Co. v. Gupton*, 241 F. Supp. 509 (E.D. S.C. 1965), extending coverage to a service station employee who, after driving the service station truck to deliver gas to a stalled automobile, was injured outside his insured vehicle while pumping gas to the disabled car; *Owens v. Ocean Accident & Guarantee Corp.*, 109 S.W.2d 928 (Ark. 1937), although not involving uninsured coverage, holding that the ambulance was being used and the patient entitled to recover even though he fell from the stretcher some distance from the ambulance. The Washington court then set forth some intelli-

gent, logical, and persuasive guidelines that should help in the resolution of the problem at hand:

> In summary, whether a person can be considered as "using" a motor vehicle and thus an insured under an uninsured motorist endorsement depends on the factual context of each case provided, however, that at least the following four criteria are met as of the time of the injury: (1) there must be causal relation or connection between the injury and the use of the insured vehicle (authorities cited); (2) the person asserting coverage must be in a reasonably close geographic proximity to the insured vehicle, although the person need not be actually touching it; (3) the person must be vehicle oriented rather than highway or sidewalk oriented at the time; and (4) the person must also be engaged in a transaction essential to the use of the vehicle at the time.

These criteria are meaningful and appealing, and the Court adopts them in the case at bar. All of these elements in the judgment of this Court are present.

1. There was a causal relation between the injury and the fire truck. Cassell had superintended putting out a fire which had required the use of the fire truck and its equipment.

2. Cassell was in close geographic proximity to the fire truck. He was only twenty to twenty-five feet away, not 164 feet as in *Perry*.

3. The circumstances were vehicle oriented. The fire could not have been so effectively extinguished without the use of the fire truck and its equipment.

4. Cassell was engaged in a transaction essential to the vehicle's use. Putting out the fire and gathering information as to the event were essential elements of Cassell's duties and part and parcel of the enterprise he was in charge of supervising. The fire trucks were also being used under Cassell's command to influence the flow of traffic on a heavily travelled thoroughfare.

The Court accordingly holds that the fire truck, a vehicle covered by the policy, was being used at the

time of the fatal accident and that Cassell is entitled to the uninsured protection afforded by the subject policy.

*The third issue: What, however, is the extent of the coverage? Were the original limits of the uninsured protection ($25,000) automatically extended to the general liability limits when the insured increased those limits to $1,000,000 without affirmative rejection?*

Even if Cassell is held to be an insured under its policy, however, Great American contends that its uninsured and underinsured limits are $25,000, and, since Harleysville has $50,000 available under its liability policy on White, the issue is moot as there are no funds available.

Relevant to the case at bar, Great American had issued its comprehensive automobile liability policy to the City of Roanoke for a period initially from October 12, 1983, to October 12, 1984. This was not a new policy but a renewal of policy No. BA 3780762 (Exhibit A). The period was apparently extended to January 1, 1985, by a penned amendment. In his letter of October 11, 1983, G. Logan Forsyth, the local insurance agent, in forwarding the binder to the City's representative, D. Darwin (Doc) Roupe, identified the policy as a renewal policy awarded on a contemplated three-year basis subject to annual review. He wrote:

> As we discussed, please sign the enclosed rejection form as respects the lower Uninsured Motorist limits and return to us in the enclosed envelope (Exhibit B).

The rejection form as submitted was signed by Mr. Roupe on behalf of the City on October 12, 1983, (Exhibit D) limiting the uninsured motorist coverage to a "*minimum* limit of $25,000/50,000." (In strict construction of the English language, it was a *maximum* limit of coverage being imposed, not a *minimum* limit. This point is made only to illustrate the carelessness of those who composed the form!) Hence for this contemplated three-year policy, subject to annual review, a rejection form was issued and executed on a renewal policy. The form, however, as the defendant points out, is not the same as that specified in § 38.1-380.2(B). Furthermore, the form used actually

imposes on the insured in this case a greater responsibility than the statute required. Great American's notice states that it must provide such notice as to the automatic, self-executing increase of uninsured limits absent affirmative rejection on all policies *and renewals*.

The plaintiff contends, however, that substantial compliance with the statutory form is all that should be required and that it gave in substance the notice contemplated by the statute. Furthermore, as to any conflict between the statutory form and its notice, that the statute should control. But this is not the point; one can impose greater responsibilities on himself than the law requires.

After an exchange of correspondence between Forsyth and Roupe on December 20, 1984, and December 26, 1984, the subject policy was again *renewed* for a policy period from January 1, 1985, to January 1, 1986, for the same coverage. But no rejection form was submitted at this time as Great American had said it had to provide on all policies *and renewals* (Exhibit D). During this policy period, however, the city decided to increase its liability coverage to $1,000,000 as evidenced by Forsyth's letter of July 5, 1985, to Doc Roupe (Exhibit I). Technically speaking, this may have been an amendment to an existing policy. But as cogently held in several of the cases cite by the defendant increasing the coverage of an existing policy in exchange for additional premium effectively creates a new policy. As noted in *United States Fidelity & Guaranty Co. v. Waln*, 395 So. 2d 1211 (Fla. App. 1981):

> The test . . . was whether the original policy has been changed "in any material respect." If it has, then the policy is "new" rather than a "renewal" and the insurance company is required to provide the insured with an opportunity to reject uninsured motorist coverage or to elect a decreased amount. This interpretation is based upon public policy favoring uninsured motorist coverage.

In *Waln* the court actually held that where, as in that case, there was only a simple substitution of one automobile for another -- and noting that there was no change in coverage -- the amendment constituted a renewal only. In

*Hartford Accident & Indemnity Co. v. Sheffield*, 375 So. 2d 598 (Fla. App. 1979), the Florida court had expounded upon the differences between a new and a renewal policy in considerable depth quoting Appleman's classic treatise on Insurance Law and Practice and cases from a number of jurisdictions. From one such case the court quotes:

> The differences in premium and coverage between the two policies thus require the conclusion that the second was not a "renewal" of the first.

Since the July 3rd amendment increased the coverage by 100% for which a handsome premium was charged, a new policy was, in fact, created. Hence, the relief from repeating rejection notices provided by the last paragraph of § 38.1-380.2(B) does *not* apply, as that section is limited to any "subsequently delivered renewal policy, extension certificate or other written statement of coverage continuance or to any subsequently mailed premium notice." In any event, whether a new or renewal policy, Great American again did not enclose any rejection form. Instead, it issued its General Endorsement # 4 for the same policy period (January 1, 1985 to January 1, 1986) but with the effective date of July 3, 1985 (Exhibit J). It is this endorsement that increased the "limit of liability" from $500,000 to $1,000,000. Although no reference was made to the uninsured motorist limits and no rejection form was submitted, the endorsement contained in all caps and underlined the following notation:

*All other terms and conditions remain unchanged*

By this expression, Great American claims that the terms and conditions of what it claims to be the existing policy as to uninsured motorist protection -- the $25,000 limits -- remain unchanged.

The plaintiff contends that its original and only notice (Exhibit D) substantially conformed to the statutory form; that it complied with all statutory requirements then in effect; that it had issued and received a rejection form when the policy was *renewed* on October 12, 1983; that as the statute provides upon receipt of the rejection form or "after twenty days, the insurer shall be relieved

of the obligation imposed . . . to attach or imprint the foregoing statement (the right to reject notice) to any subsequently delivered renewal policy, extension coverage, other written statement of coverage, or to any subsequently mailed premium notice"; that this was a renewal policy (the policy issued on January 1, 1985), or at least another "written statement of coverage" (the amendment of July 3, 1985), and since a rejection form had already been executed on the preceding policy, the insurer was relieved of the obligation to issue another rejection notice. In other words, once having received an affirmative rejection, it was relieved of any requirement to repeat the notice on any subsequent renewals or amendments. Furthermore, Great American urges that its General Endorsement Form # 4 (Exhibit J), which increased the liability coverage from $500,000 to $1,000,000, expressly provided that "all other terms and conditions remain unchanged"; that is, that the uninsured limits were to remain as they were.

Cassell urges, on the other hand, that the original notice given (Exhibit D) does not comply with the statute either in content or form; that it does not contain the statutory title "IMPORTANT NOTICE" nor is it set forth in bold-faced caps. Furthermore, the actual notice given misleads an insured by the expressed commitment, irrespective of the statute, that it will give such reminder of an insured's opportunity to reject on all renewals.

The defendant's main argument, however, is centered on the precise language of § 38.1-380.2(B)(3) as incorporated by reference in the proviso to the first sentence of § 38.1-381(b), which states:

> provided, that such limits, after January 1, 1983, shall be equal to, but not exceeding, the limits of the liability insurance afforded by such policy, *unless the insured rejects* such additional uninsured motorist insurance coverage by notifying the insurer *as provided in Section 38.1-380.2(B)(3).*

In other words, the defendant urges that this proviso gives an insured a right to reject as distinguished from an insurer's duty to notify; that there are two correlative concepts created by the statutes: one a duty of the insurer

to notify and the other a right of an insured to reject. Irrespective of whether or not the insurer has complied with the notice requirement, the defendant contends that the uninsured limits are automatically extended to the amount of the general liability limits unless, as the aforesaid proviso states, "the insured rejects such additional uninsured motorist coverage" as provided (and limited) by 38.1-380.2(B)(3).

This latter section, upon careful analysis, provides in substance that the premium charge for the insurance coverage may be increased (because of the automatic increase of the uninsured motorist protection) if the insured does not notify the insurer within twenty days of the relevant mailing. What the subject matter of such notification from the insured is supposed to be is not expressly mentioned, but in logic and common sense and when read with Section 38.1-381(b), the notice would have to relate to the insured's *intent or desire to reject* the otherwise self-executing increase of uninsured motorist coverage -- or at least such is the argument of the defendant.

## Conclusion

The clash of these contentions, each with varying merit and appeal, demonstrates clearly that the matter is not clear. The policy of the law, however, and the obvious basic intent of the legislature to provide automatic increase of uninsured motorist protection when the liability coverage is increased unless such modification is affirmatively rejected compels the conclusion in the absence of such affirmative rejection that such increase should be granted in this case. The reasons that prompt this conclusion and override the plaintiff's arguments may be summarized as follows:

(1) In the first place, the plaintiff did *not* initially comply with the notice requirement as required by the statute (§ 38.1-380.2(B)). The legislature went to the trouble and detail of spelling out the precise notice -- verbatim -- that would be required. The form and content of the notice was mandated. The plaintiff chose to ignore this command. Standing alone, of course, this deficiency is irrelevant because the insured responded to the notice given.

(2) Secondly, the notice that Great American actually gave, authored no doubt by its staff of experts and specialists, committed itself to give such notice on its renewals. It did not keep its promise when the policy was renewed on January 1, 1985.

(3) Thirdly, the "amendment" of July 3, 1985, actually created a "new" policy as the coverage was substantially increased and a large premium charged. Hence, relief from giving another notice of the opportunity to reject was not granted by the last paragraph of § 38.1-380.2(B) as a "new" policy was involved.

(4) Hence, whether considered a renewal policy or a new policy, since no notice was given, the automatic increase of uninsured motorist protection attaches, commitment to give such notice on renewals having been voluntarily made by the plaintiff and/or the statute not extending any relief from giving such notice on a new policy.

(5) Fourthly, the insured did not affirmatively reject the automatic, self-executing increase as it had a right to do -- in order to avoid potential increase in premiums -- under § 38.1-380.2(B)(3) which § 38.1-381(b) incorporates by reference.

(6) Finally, Endorsement # 4 (Exhibit J) is ambiguous on its face and could reasonably be interpreted to mean that "the limit of liability under the above policy" being increased from $500,000 to $1,000,000" embraced *all* liability, including the uninsured motorist protection.

In the final analysis, the underlying purpose and humanitarian objective of the legislation at issue must be kept uppermost in mind. The intent of the law was to provide adequate insurance for the responsible insured who might be injured by a financially irresponsible driver. The City of Roanoke in its efforts to be financially responsible for injuries that its drivers might cause to others sought to increase that protection by doubling its coverage; it was in all candor probably giving no thought to injuries its employees might sustain from irresponsible drivers. But it did not reject the automatic increase that the legislature was trying to extend; nor did the insurer affirmatively advise its insured of its right to refuse when it issued the rather substantial and significant amendment to the existing policy on July 3, 1985 -- an "amendment" that generated an additional

premium of $24,129 and because it generated such substantial and material changes should be construed as, in fact, a new policy.

Both sides have referred to cases from other jurisdictions to support their respective arguments. Each has been reviewed, but the case of *State Farm Mutual Ins. Co. v. Arms*, 477 A.2d 1060 (Del. 1984), is particularly appealing. In that case the court held, as had the Florida cases, that an increase in coverage was a change of such significant moment that it should be construed as a new policy rather than a mere renewal. Some of the observations of Justice Moore in that decision are particularly pertinent. He noted, for instance:

> Given the continued increase in the number of motor vehicles on the road and off, the reduction in the driving age, and the exponential increase in medical expenses and concurrent decrease in federal medical care payments, the need to compensate injured persons through insurance coverage has become absolutely critical.

And further:

> Insurance policies typically are not negotiated agreements. Consumers are presented with a complex form agreement on a take-it-or-leave-it basis. The industry has its own obscure terminology which, despite efforts toward plain language policies, is nevertheless difficult for the typical consumer to understand fully. In these respects, insurance agreements are classic examples of contracts of adhesion. (Authorities cited). The prospect of overbearing is sufficiently great . . . to require dissemination of important information which many consumers, other than the most diligent, might not discover.

And finally:

> it is important to note that uninsured vehicle coverage was developed originally to compensate

for injuries caused by hit-and-run drivers, as well as financially irresponsible motorists. Here, Arms was involved in a hit-and-run accident. The driver has never been identified. Plaintiff's coverage, despite his efforts, is less than adequate. Arms is, therefore, clearly within the class of innocent motorists which the uninsured motorist laws were designed to protect.

And as Arms was within the class of innocent motorists that the uninsured motorist laws were designed to protect, so also was Robert G. Cassell, a dedicated public servant of many years' standing, a captain of the City Fire Department, cruelly killed in the line of duty and, at age fifty, in the prime of his life, while serving his fellow man. His widow and children should not be deprived of benefits the legislature intended to extend, unless affirmatively rejected, by an overgenerous interpretation of words and phrases favorable to the party who authored them and whose inattention to important detail provoked the ambiguities that must be charged against them.

The Court accordingly declares that Cassell was in the process of using an insured vehicle, even though not occupying it, within the contemplation of the statute, and hence is covered by the policy. And further, the Court declares that the limits of $1,000,000 are applicable to the uninsured and underinsured motorist coverage under the facts and circumstances of this case.